IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

DARLENE PENA on behalf of
DYLAN PENA,

06 JAN -9 PM 4: 05

No. CIV 04-1352 LFG/RLP

Plaintiff,

CLERK-ALBUQUERQUE

v.

BELEN CONSOLIDATED SCHOOLS et al.,

Defendants.

### PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, through undersigned counsel, propose the following findings of fact and conclusions of law.

### I. Proposed Findings of Fact

1. Debra Poulin and Tara Ford were co-counsel in the case of Darlene Pena on behalf of Dylan Pena, DPH 0304-04, a special education due process proceeding filed pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415, et seq.

2. Dylan was born in March, 1999. At the time that the due process case was filed with the New Mexico Public Education Department, Dylan was a four year old child. Dylan was born profoundly deaf. At the age of eighteen months, Dylan had a cochlear implant which is a device that helps Dylan to hear sounds which he must then learn to interpret.

3. This case involved Ms. Pena's concerns that Belen Consolidated Schools ("BCS") had not provided her son Dylan with a free appropriate public education as required by the IDEA. Ms. Pena's general concerns were that BCS had failed to offer or provide Dylan

with *any* special education beginning at age three as required by the IDEA and then belatedly offered him an educational program that would not meet his needs as a child with a cochlear implant who required on oral language program.

4. During the time when BCS failed to offer or provide Dylan with any type of IEP, he attended the Presbyterian Ear Institute ("PEI"), a private school that provided educational services to children with cochlear implants. Dylan was on a scholarship at the PEI but still was required to pay partial tuition. In addition, Ms. Pena had to transport Dylan almost seventy miles each day to and from school. Ms. Pena wished to be reimbursed for these expenses.

5. BCS failed to offer special education services to Dylan as of his third birthday, as required by federal law. Later, when BCS belatedly offered Dylan an individualized educational program ("IEP"), it failed to offer the special education services Dylan required to meet his special needs. Specifically, BCS believed that a child with a cochlear implant should not receive different services than a child without a cochlear implant. Thus BCS rejected Ms. Pena's request for an oral language program. Instead, BCS insisted that Dylan should attend the New Mexico School for the Deaf ("NMSD"). However, as the administrative Hearing Officer later found, at the time Dylan first became eligible for special education through BCS, NMSD did not have an oral language program for students with cochlear implants. In contrast, the Hearing Officer also found that prior to Dylan's turning five, PEI's program *was* appropriate to meet Dylan's needs.

6. There was a pre-existing and hotly debated national controversy concerning the instruction of children with cochlear implants. Specifically, some providers believed that

deaf children with cochlear implants should be instructed in the same manner as all deaf children, while other providers believed that deaf children with cochlear implants should be provided an oral language program. NMSD and PEI were part of this debate. At the time Ms. Pena sought services for her son, PEI offered an oral language program, while NMSD did not.

7. In her Amended Due Process Hearing Request, Ms. Pena requested the following relief:

   a. partial tuition reimbursement for 2002-2003 (school year) and tuition for 2003-2004 (school year) at PEI;

   b. transportation reimbursement for 2002-2003 (school year) and 2003-2004 (school year);

   c. *consideration* of a Joint Powers agreement between PEI and BCS;

   d. training for BCS staff on strategies for full parent participation.

8. Ms. Pena was ultimately successful on the majority of her substantive requests. Specifically, the Due Process Hearing Officer found that BCS denied Dylan a free appropriate public education from March 2, 2002, to January 10, 2003, omitting summer school. He therefore ordered reimbursement for partial tuition and mileage from March 2, 2002 through the end of the 2002 / 2003 school year. The Hearing Officer also awarded Mrs. Pena compensatory education services, thereby exceeding her original request for compensatory relief. *Id.*

9. The Hearing Officer rejected Ms. Pena's claims for reimbursement for summer school, as well as Mrs. Pena's claim that Dylan did not receive a free appropriate public education during the 2003 - 2004 school year. As the Hearing Officer found, by the time of the Due Process hearing, NMSD had developed a program for students with cochlear implants.

3

which, in practical effect, made Mrs. Pena's request for future placement moot.

10. After filing the due process hearing request, Ms. Poulin and Ms. Ford made numerous attempts on behalf of Ms. Pena and Dylan to resolve this case without the necessity of a hearing. Counsel and Ms. Pena approached settlement with an open mind toward compromise.

11. The first effort at settlement was at a mediation session held on September 11, 2003. That session did not result in a settlement. At that mediation session, BCS was unwilling to discuss any possible resolution of the case other than Ms. Pena's dismissal of the case.

12. At the first mediation session, it was clear that BCS was using Dylan's case as a "test case," to try to prove that PEI could not appropriately serve Dylan or any other child with a hearing impairment. Instead, BCS favored the New Mexico School for the Deaf ("NMSD") as the exclusive appropriate placement for all deaf or hearing impaired children attending BCS.

13. BCS would not even discuss settlement of the less controversial aspects of Dylan's case such as the complete failure to provide any educational program at age three or the failure to evaluate for physical and occupational therapy needs or to provide such services.

14. Throughout the proceedings, the New Mexico School for the Deaf took a more and more active role in the case, even though it was not a party. Specifically, by the time of the Due Process hearing, representatives from the NMSD were attending the hearing in the role of unnamed parties to the proceedings, and, NMSD's interests were represented by their own counsel and by counsel for BCS during the proceedings. NMSD representatives and their counsel participated in consultations with BCS and counsel that

4

were deemed privileged communication by counsel for BCS, and NMSD was assisting in funding the attorney's fees for BCS.

15. At the same time, Ms. Bratton and BCS continued to refer to Ms. Pena's counsel as representing PEI, which they did not. Through Ms. Bratton, BCS stated that, if Ms. Pena succeeded, there were "children lined out of the door" to use BCS public funds to pay for education at PEI. Counsel, however, did not know any child with a cochlear implant other than Dylan and never "represented" PEI. Instead, Ms. Pena and her attorneys were caught in the middle.

16. After this first failed attempt at settlement, counsel sent letters to Ms. Bratton in an attempt to move the parties towards settlement. On September 30, 2003, Ms. Poulin sent a settlement letter to Ms. Bratton offering to settle the case as follows:

   a. the District reimburse Ms. Pena $420.00 for tuition paid in the 2002-2003 school year and reimburse her for tuition for 2003-2004;

   b. the District agree to provide Ms. Pena with transportation reimbursement;

   c. the District continue to provide related therapy services to Dylan;

   d. the parties agree that the agreement concerning reimbursement shall not have any preclusive effect on the issue of placement for Dylan in the 2004-2005 school year;

   e. discounted attorneys fees on approximately $12,000 fees to date of letter;

   f. agreement to dismiss the due process request with prejudice.

17. Ms. Bratton, by letter dated October 9, 2003, rejected this offer on behalf of BCS. BCS did not make any counterproposal or suggestions for settling the case, and further stated

that BCS did not see any benefit in continuing mediation. Indeed, BCS went so far as to ask the mediator to vacate the mediation. BCS took the position that in her settlement offer, Ms. Pena had "ask[ed] for all the relief Ms. Pena is seeking in this case."

18. By letter dated October 10, 2003, Ms. Pena, through counsel, requested that BCS reconsider its position.

19. Ms. Bratton assured counsel that she had discussed the offer with her clients who rejected the offer. On behalf of BCS, Ms. Bratton advised, "We'll mediate until the cows come home, but we won't be sending any public money to PEI, because we can't." Ms. Pena, however, had offered to settle for reimbursement of incurred expenses, leaving the issue of BCS's relationship with PEI, with regard to future services for Dylan, for another day.

20. At the second mediation, on November 21, 2003, counsel and Ms. Pena met with the mediator and had worked to develop a compromise position in an attempt to settle the case. However, Ms. Poulin only had an opportunity to speak with Ms. Bratton in the hallway. She advised Ms. Bratton that Ms. Pena would accept $5,000 in reimbursement and reduced attorneys fees and costs to settle the case. This was a reduction even from the reasonable written offer Ms. Pena previously made. After meeting with her clients briefly, Ms. Bratton refused the offer. She stated that BCS would not use public money to fund an education at PEI for any child. BCS took the position that because PEI did not provide an appropriate education to Dylan, public or federal monies could not be used to fund Dylan's education at PEI.

21. BCS never made any type of offer of judgment in this case at any time.

22. In addition, BCS filed two motions for summary judgment, contending that NMSD was

6

    the only placement that could have provided or would provide Dylan with a free appropriate public education. Motion practice, such as summary judgment, is not common in special education due process proceedings. There are no procedures for discovery in these proceedings, which makes summary judgment difficult and time consuming.

23. The Hearing Officer denied both motions in a seventeen-page opinion.

24. This case involved complex issues of law, a large number of witnesses and expert testimony and a significant amount of work, including two motions for summary judgment, an eleven day due process hearing over a period of three months and a lengthy post-hearing briefing process.

25. Ms. Bratton requested that the due process hearing be held in a conference room at her office, which ultimately increased the length of the Due Process hearing.

26. The special education due process procedures have no mechanism for discovery. Prior to the due process hearing, Ms. Pena's counsel made numerous attempts to obtain information that would assist them in reducing the length of time necessary for the hearing. They met with resistance from both BCS and NMSDP on basic requests for public records and other information necessary to presentation of the case. This too increased the costs of the case and prolonged the hearing because counsel were forced through witnesses to spend time presenting basic information about some of the issues, such as the NMSD capacity to serve children with cochlear implants and BCS special education policies and procedures.

27. After a full administrative hearing, Ms. Pena requested the following relief: (1)

reimbursement for the private school tuition that she had paid to the Presbyterian Ear Institute beginning on March 2, 2002; (2) reimbursement for mileage for the costs of transporting Dylan to the Presbyterian Ear Institute beginning on March 2, 2002; (3) compensatory education services for BCS's failure to evaluate Dylan for occupational and physical therapy services and failure to provide or offer Dylan related services of physical and occupational therapy from March 2, 2002 to January 10, 2003 with the amount and form of those services to be determined by an IEP team; (4) provision of a comprehensive sensory integration evaluation; and (5) development of an IEP for the 2004 to 2005 school year which designated PEI as Dylan's placement or, alternatively, that BCS be ordered to develop an appropriate program for Dylan to ensure education in an oral language program.

28. The Due Process Hearing Officer gave Ms. Pena most of the relief she requested in the form of reimbursements. He concluded that BCS denied Dylan a free appropriate public education from March 2, 2002 to January 10, 2003. He therefore ordered that Ms. Pena be reimbursed for her expenses through Spring semester, 2003.

29. The Hearing Officer also concluded that as of January 10, 2003, BCS had at least started to make a free appropriate public education available to Dylan because by then NMSD -- its proposed placement -- had worked to develop a program that could have met Dylan's needs for an oral language program. The January 10, 2003 IEP, however, came too late to have provided Dylan a free appropriate public education during Spring, 2003. He therefore granted reimbursement through Spring semester, 2003. He denied reimbursement from Fall semester, 2003 on.

30. The value of the relief awarded to Ms. Pena and Dylan is approximately $9,756.01 ($4316.01 for tuition and mileage reimbursement and $5440.00 for the compensatory education services). The tuition/mileage is actual cost that has been paid to Ms. Pena. The $5440 is a calculation based on 64 hours of service at $85.00/hour.

31. The relief awarded by the Hearing Officer exceeded the relief proposed by Ms. Pena to settle the case at both the September 30, 2005 settlement proposal letter and at the second mediation. Specifically, at the second mediation, Ms. Pena offered to settle for reimbursement of $5,000 for tuition and mileage through spring semester, 2003. She was awarded somewhat less than that figure, $4,316.01 for tuition and mileage through Spring Semester, 2003, but was also awarded additional compensatory educational services worth $5,440.00.

32. Because of the position taken by BCS about PEI, Ms. Pena was forced to litigate the appropriateness of PEI to obtain relief for tuition reimbursement and mileage reimbursement. There was absolutely no compromise on BCS's part on any issue in the case.

33. Delays have continued in this case. Despite at least six formal requests for compliance with the Hearing Officer's Order, Ms. Pena was not reimbursed until on or about October 25, 2005 and only after Ms. Pena had to resort to filing a complaint for failure to comply with the Hearing Officer's Order with the Public Education Department, Special Education Bureau. BCS still did not provide the compensatory educational services order by the Hearing Officer. The Public Education Department reviewed Plaintiff's complaint and ordered BCS to provide compensatory educational services.

34. Two attorneys were needed for effective litigation of Ms. Pena's claims. During the case, BCS was represented by several attorneys and legal assistants at a large and well-established law firm.

35. Even NMSD was represented by counsel. The New Mexico School for the Deaf, which was the BCS proposed placement for Dylan, joined with BCS to challenge Dylan's placement at PEI throughout this case.

36. Counsel for BCS took a very aggressive stance in this litigation, including an unsuccessful motion to disqualify Ms. Poulin for alleged ethical violations, two unsuccessful motions for summary judgment, and investments in visual aids traditionally reserved for jury trials, including a videotape presentation on the educational value of NMSD, and a power point presentation.

37. BCS or its insurer paid at least $ 64,000.00 in fees and costs to the Modrall law firm, to defend Ms. Pena's claims. In addition to actual attendance at the Due Process hearing and related hours, this figure included approximately fifty six hours for pre-hearing preparation and eighty four hours for drafting pre-trial dispositive motions and documentary exhibits. This figure of one hundred and forty hours does *not* include client contact, opponent contact, coordination or other pre-hearing details. In addition, BCS paid $1,035.11, or over one fifth the amount sought by Ms. Pena as expense reimbursement, to a professional videographer, to prepare a videotape concerning the New Mexico School for the Deaf. The logical inference is that Ms. Pena was required to spend substantial time in response to BCS's well mounted defense.

38. NMSD reimbursed BCS for some of its costs of litigation, as well as having an NMSD

attorney defend NMSD's interests in the case. NMSD paid $ 5,000.00 in attorney's fees for the defense of Ms. Pena, which, ironically, is the amount Ms. Pena offered to accept in exchange for dismissing her Due Process complaint. Ms. Pena was therefore required, in effect, to respond to two parties.

39. Ms. Poulin is a highly experienced and qualified attorney, with high level expertise in the area of special education law. Ms. Poulin's reasonable market rate is at least $ 190.00 per hour. Ms. Poulin actually incurred $ 56,725.00 in attorney's fees, in representing Ms. Pena. Ms. Poulin also incurred $ 1,342.55 in litigation expenses. Gross receipts on $ 58,067.55 in Santa Fe County is $4,391.36.

40. Tara Ford is a highly experienced and qualified attorney, with expertise in the area of special education law. Ms. Ford's reasonable market rate is at least $ 175.00 per hour. Ms. Ford actually incurred $ 50,325.00 in attorney's fees, in representing Ms. Pena.

41. The complexity of this case and the vigorous response by the defense support reasonable attorney's fees of at least $ 92,204.43.

## II. Proposed Conclusions of Law

1. Pursuant to 20 U.S.C. § 1415 (e) (4) (B), Plaintiff is a "prevailing party" because she succeeded on a significant issue in the litigation which achieved some of the benefit she sought in bringing suit and because BCS failed to appeal the Hearing Officer's conclusion that Plaintiff was a prevailing party. *Texas State Teachers Ass'n v. Garland Independent School District*, 489 U.S. 782, 788-91 (1989).

2. Plaintiff's situation, at the very least, is analogous to the parents in *Fowler v. United States School District* No. 259, 107 F.3d 797 (10th Cir. 1997), where the school district

was ordered to reimburse the parents at least partially for a sign language interpreter.

3. In setting a reasonable fee, the Tenth Circuit has provided six factors for the district court to consider, including "(1) whether the tasks being billed would normally be billed to a paying client, (2) the number of hours spent on each task, (3) the complexity of the case, (4) the number of reasonable strategies pursued, (5) the response necessitated by the maneuvering of the other side, and (6) potential duplication of services by multiple lawyers." *Robinson v. City of Edmond*, 150 F.3d 1275, 1281 (10th Cir. 1998) (citation omitted). On the other hand, the Tenth Circuit has also made clear that this determination is, in the end, an equitable determination to be made on a case-by-case basis. No single factor is dispositive, and the factors clearly can overlap.

4. "Billing judgment" as this term is used in *Robinson* and like cases, supports a reduction of Ms. Fords hours to 227.8 hours at $175 and a reduction of Ms. Poulin's hours to $248.90 at $190, plus litigation expenses and gross receipts taxes as follows:

Ford    227.8 hours at 175     $39,865.00

Poulin  248.9 hours at 190     $47,291.00
        Litigation Expenses    $ 1,342.55
        Poulin GRT (.07562)    $ 3,705.88

**$92,204.43**

5. The novelty and complexity of the legal issues may be considered by the district court in determining the reasonable number of hours expended. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 108 S.Ct. 3078, 3087-3088 (1987), as cited in *Cooper v. State of Utah*, 894 F.2d 1169, 1171 (10th Cir. 1990). Here, for example, the cochlear implant is a relatively new innovation to assist deaf persons, and the emphasis on oral

language education to support and enhance the implant is a new and controversial theory.

6.  The response of BCS also supports the reasonableness of the number of hours. Thus the "potential for protracted litigation" is a factor that may be considered in determining the complexity of a case, in setting a reasonable number of hours expended. *Delaware Valley Citizens' Council for Clean Air,* 107 S. Ct. at 3087-88, as cited in *Cooper v. State of Utah,* 894 F.2d 1169, 1171 (10th Cir. 1990). Here, the School District filed two motions for summary judgment. While there were no amicus briefs filed, the New Mexico School for the Deaf became, essentially, a second respondent, participating in the process at every level, as ersatz amicus or even as an unofficial party. The hearing lasted eleven days, and included expert testimony, and a level of preparation and sophistication usually reserved for federal jury trials.

7.  In addition, in reaching a decision, the Hearing Officer himself found the need to write a seventeen page opinion rejecting the School District's dispositive motions and a thirty-eight page decision on the merits. The Hearing Officer's final decision reflects the subtlety of the issue whether PEI was able to provide Dylan a free appropriate public education, the central issue of the case and an issue on which Dylan's mother ultimately prevailed.

8.  The defense response also supports the reasonableness of this fee. "The Tenth Circuit has long accepted the proposition that one of the factors useful in evaluating the reasonableness of the number of attorney hours in a fee request is the responses necessitated by the maneuvering of the other side. The Supreme Court has also recognized that part of an attorney's calculus of the amount of time reasonably necessary

13

for a case is the vigor which the opponents bring to the dispute." *Robinson*, 160 F.3d at 1284. Here, a significant factor in the reasonableness of Ms. Pena's attorney's fees is the refusal by BCS to settle this matter in any way that required BCS to fund any part of Dylan's education at PEI. Instead, BCS drew an absolute line that IDEA monies could never be paid to PEI because PEI did not provide a free appropriate public education. In contrast, prior to incurring the majority of fees for which she now seeks reimbursement, Ms. Pena offered in writing to settle this entire matter for something in the neighborhood of $17,000.00 --- approximately $5,000 in reimbursement and $12,000 in fees. Moreover, Ms. Pena signaled in the same written offer that she would be willing to discount her fees if the parties could reach an agreement.

9. In risking lengthy litigation, BCS presumably believed in good faith in the correctness of its legal argument. Nonetheless, BCS chose the unsuccessful course to litigate its legal opinion through to the end, thereby necessitating Ms. Pena's involvement in this highly complex administrative proceeding. "The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *Robinson*, 160 F.3d at 1284, *citing City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986).

10. Indeed, the hours expended by counsel for BCS is both a factor in its own right, in setting a reasonable fee for Ms. Pena, and a measure of the complexity of the case overall.

> The evidence of the hours expended by defense counsel is not, of course, an immutable yardstick of reasonableness and it may be disregarded or discounted as a comparative factor if found to be unreasonable in its own right. However, here the effort expended by the defendants suggest at least that they viewed the case as sufficiently complex and serious to warrant the expenditure of large amounts of

14

attorney time, and it highlights the tooth-and-nail litigating approach the city used in this case. In light of this tenacious effort by the city and its lawyers, the amount of attorney time expended by the plaintiffs begins to look more reasonable, not less.

*Robinson*, 160 F.3d at 1284.

11. Ms. Pena's loss on some issues does not support a drastic reduction in fees. "Once an applicant for a fee has carried the burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be a reasonable fee as contemplated by Section 1988." *Cooper*, 894 F.2d at 1171. Thus "when a plaintiff achieves the principal goal of her lawsuit, lack of success on some of her interrelated claims may not be used as a basis for reducing the plaintiff's fee award. When a plaintiff achieves most or all of what she aimed for in a civil rights lawsuit, her lawyer should receive a fully compensatory fee. . . . [T]he most critical factor is the degree of success obtained." *Robinson*, 160 F.2d at 1283 (citations and internal punctuation omitted). The Supreme Court in *"Hensley* made it abundantly clear that failure on some interrelated claims is not nearly as important as the 'overall relief' obtained by the plaintiff." *Id.* (citation omitted).

12. Ms. Pena was successful in litigating the central and critical issue cited by BCS in its rejection of her settlement offer and in its dispositive motions — that Ms. Pena could not be reimbursed for her payments to PEI, because PEI was not providing an appropriate education to children with cochlear implants. Indeed, BCS itself stated that Ms. Pena's settlement offer had "ask[ed] for all the relief Ms. Pena is seeking in this case." In her offer, Ms. Pena sought reimbursement for her payments to PEI and her mileage; she

15

ultimately won an equivalent amount in compensation, and was fully vindicated in her position that PEI offered an appropriate education for Dylan. Thus, by BCS's own admission, Mrs. Pena won the relief she was seeking.

13. Once reasonable fees are set, any type of mechanical *pro rata* reduction for lack of success has been all but flatly rejected by the Tenth Circuit. *See, e.g., Sinajini v. Board of Education of the San Juan School District*, 233 F.3d 1236 (10th Cir. 2000). Thus a lawsuit with both successful and unsuccessful claims cannot justify a percentage reduction in attorney's fees, unless the unsuccessful claims can be clearly isolated from the overall favorable resolution. Here, as a factual and legal matter, the unsuccessful claims cannot be clearly isolated from Ms. Pena's success in obtaining reimbursement and compensatory educational services exceeding her settlement proposals.

14. The complexity of this case and the vigorous response by the defense support reasonable attorney's fees of $ 92,204.43

Respectfully submitted,

LAW OFFICES OF NANCY L. SIMMONS, P.C.

*Nancy L. Simmons*
Nancy L. Simmons
2001 Carlisle Blvd. NE Suite E
Albuquerque, New Mexico 87110
(505) 232-2575
Attorney for Plaintiff